## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TAMMY ELIZABETHE P.,[1]

    Plaintiff,

v.

KILOLO KIJAZAKI,
Acting Commissioner of Social Security,

    Defendant.

Civil Action No. 20-cv-3693-RMM

## MEMORANDUM OPINION

Tammy Elizabethe P. brought this action under the Social Security Act, 42 U.S.C.

§ 405(g), seeking judicial review of a decision of the Commissioner of Social Security denying

her claim for supplemental security income benefits.  Pending are Ms. P.'s Motion for Judgment

of Reversal, ECF No. 11, and the Commissioner's Motion for Judgment of Affirmance, ECF No.

12.  Having reviewed the Administrative Record,[2] the parties' briefs,[3] and the relevant law, the

Court grants Ms. P.'s motion and remands this matter to the agency.

## BACKGROUND

Ms. P. is a Canadian citizen currently living in Canada.  *See* AR 49, 399.  She worked in

the United States between July 1992 and December 2000, and again from January 2003 until

---

[1] Plaintiff's name has been partially redacted in keeping with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Mem. from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt., to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf.

[2] Page citations to the Administrative Record, ECF No. 8 ("AR"), refer to the running pagination at the lower right margin.

[3] The relevant briefs are Plaintiff's Mot. for J. of Reversal, ECF No. 11 ("Pl. Mem."); Defendant's Mem. Supp. Mot. for J. of Affirmance and Opp'n to Pl. Mem., ECF No. 13 ("Def. Mem."); and Plaintiff's Reply, ECF No. 14 ("Pl. Reply").

October 2011, making her eligible for benefits under the Social Security Act through December 31, 2016 (her "last insured date").  AR 29, 399.  In February 2018, Ms. P. applied for benefits alleging that she was disabled beginning August 25, 2015 (her "onset date") due to pain in her hip, shoulder, groin, and jaw, as well as anxiety and depression, trouble focusing, problems walking long distances and sitting for extended periods, and difficulty sleeping.  AR 433, 436.

Ms. P.'s application for benefits was denied at both the initial and reconsideration phases of review.  AR 27.  Ms. P. then filed a request for hearing before an Administrative Law Judge or "ALJ."  *Id.*  The hearing was conducted before ALJ Dale Black-Pennington in February 2020. *Id.*  The ALJ issued an unfavorable decision on March 16, 2020, concluding that Ms. P. was not disabled for purposes of the Social Security Act because her limitations did not prevent her from performing past relevant work as an administrative clerk or bookkeeper between her onset date and her last insured date.  AR 24, 27–37.  The Appeals Council denied Ms. P.'s request for review.  AR 1.  Ms. P. now asks this Court to vacate the ALJ's opinion, which constitutes the Commissioner's final decision, and remand her application for disability benefits to the Social Security Agency ("SSA") pursuant to 42 U.S.C. § 405(g).

I.    **Legal Framework**

To qualify for benefits under the Social Security Act, a claimant must demonstrate a disability that renders her unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(a), 423(d)(1)(A), 1382(a)(1), 1382c(a)(3)(A).  The applicant must support her claim with "[o]bjective medical evidence."  *Id.* § 423(d)(5)(A).

The Commissioner uses a five-step process to determine whether a claimant is disabled under the Act.  20 C.F.R. §§ 404.1520, 416.920; *see also Butler v. Barnhart*, 353 F.3d 992, 997

(D.C. Cir. 2004) (describing each step).  At step one, the claimant must show she is not engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step two, the claimant must show she has a "severe medically determinable physical or mental impairment" or combination of impairments.  *Id.*  At step three, the Commissioner must determine whether the claimant's impairment or impairments meet or equal an impairment in the Commissioner's Listings maintained at 20 C.F.R. pt. 404, subpt. P, app. 1.  *See id.*  If the claimant's impairment is listed, or if her impairments together "equal" an impairment in the Listings, the Commissioner will determine that the individual is disabled and award her benefits.  *See id.*

If the claimant is not determined to be disabled at step three, the Commissioner must then assess the claimant's residual functional capacity or "RFC."  20 C.F.R. § 404.1520(a)(4), (e); *id.* § 416.920(a)(4), (e).  Residual functional capacity measures what an individual "can do in a work setting" despite the person's physical and mental limitations.  *Id.* § 404.1545(a)(1).  The RFC is then used to determine, at step four, whether the claimant's impairments prevent her from performing "past relevant work," *id.* §§ 404.1520(a)(4), 416.920(a)(4), and at step five, whether the claimant can perform other work that exists in the national economy consistent with the claimant's age, education, and work experience.  *Id.*; *see also Butler*, 353 F.3d 997.  If an individual's claim fails at either step four or five, the Commissioner will conclude that the individual is not disabled and deny the claimant's benefits request.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## II.    Record Evidence

Ms. P.'s disability application stems from a car accident in Ontario in October 2014 that Ms. P. claims caused her debilitating, long-lasting pain.  *See* AR 33, 55–56, 528.  She was evaluated one week after the accident by Dr. Tarik Farooq, who documented Ms. P.'s complaints of pain in the back of her head, neck, and back.  AR 532.  Imaging of Ms. P.'s spine the

following month showed mild osteoarthritis and minimal degenerative disc disease but no factures or angulation deformity.  AR 835.  An MRI taken in January 2015 found "very mild degenerative disc desiccation" in her lumbar spine, no focal disc herniations, and "no abnormalities" in her regional soft tissues.  AR 530.

Over time, it became clear that Ms. P.'s ongoing discomfort was centered primarily in her right hip.  By January 2015, Ms. P.'s physicians documented "mild bilateral osteoarthritis involving the hip joints," with particularly prominent acetabular coverage in her right hip.  *Id.*  A CT scan of the right hip taken a year later showed severe osteoarthritic changes, AR 531, 535, necessitating a total hip replacement in March 2016.  AR 529, 539–540.  At the time Ms. P. was standing only with the aid of a rollator walker and was observed "let[ting] out audible exhales and gasps at times" when standing and walking.  AR 574, 871.

After her surgery, Ms. P. regained some mobility in her hip but continued to report significant pain.  She started physical therapy within a few weeks of the operation, *see* AR 808, and for a time made significant improvements in her range of motion and weightbearing ability.  AR 820, 873.  An assessment in September 2016 revealed Ms. P. could ambulate without aids but had an antalgic gait; she also evidenced "sitting intolerance."  AR 526, 537.  The physician also noted "painful passive motion of the right hip."  AR 541.  These findings were considered "not unusual" given her recent hip replacement surgery.  AR 541.

Ms. P. nevertheless continued to report "ongoing pain in her low back, buttock, and groin" that she believed was "worse in some ways than it was even preoperatively[,] despite her improvements in rage of motion."  AR 820; *see also* AR 873 (documenting complaints of "significant pain . . . different from her prior [pain]").  She reported that her postoperative pain also radiated to her right shoulder and neck.  AR 820, 874–75.  Her treating physiotherapist, Dr.

4

Shaun Lapenskie, wrote in September 2016 that Ms. P. continued to demonstrate "a high degree of fear of movement" and "ongoing right sided facial, TMJ and ear pain" consistent with behaviors developed to compensate for weakness in her right hip.  AR 151–52, 553–54.  He concluded that her continued experience of pain was due to "altered movement patterns . . . as well as altered pain processing in the central nervous system due to the chronicity/intensity of her pre-operative pain."  AR 152, 554.  Dr. Lapenskie also noted that Ms. P. "continue[d] to present catastrophizing beliefs about her pain."  *Id.*

By November 2016 Ms. P. had been referred to a pain clinic.  *See* AR 647.  An ultrasound taken the same month revealed "[m]ultiple calcifications measuring up to 1.6cm" in the right hip area, fluid accumulation (potentially due to medical injections), and a "[d]efect in the muscles in the lateral aspect of the right hip."  AR 644, 830.  Medical consultations also dated November 2016 noted that Ms. P.'s pain was "significant," potentially progressive, and resistant to medication interventions including injections.  AR 653, 830.  One examining physician hypothesized that a nerve root might be impinged.  *See id.*  A follow-up appointment in December 2016 revealed that injections "really just made her [pain] worse" and concluded Ms. P. suffered from a "'wind up' phenomenon and central sensitization."  AR 833.

Ms. P. did not apply for disability benefits in the United States until February 2018, however—just over a year later.  *See* AR 433, 436.  Soon after, Canadian vocational rehabilitation specialist Krystyn Scrbic concluded that Ms. P. could not apply her "valuable skills and education" in the workforce due to "her ongoing collision-related pain and impairments." AR 716.  In addition to pain, Ms. Scrbic opined that Ms. P. had "permanent" limitations on her ability to walk and sit for extended periods, and that her "ability to concentrate appears to be impacted by her pain."  *Id.*  The limited concentration caused Ms. P. to perform poorly in timed

tests, "suggesting that she would have limited productivity in a time sensitive work environment (i.e. most work environments)." *Id.*  She concluded that Ms. P. "is not competitively employable." *Id.*  A December 2018 assessment by Dr. Charalabos Bob Karabatsos, a Canadian orthopedic surgeon, concluded that Ms. P.'s prognosis was "poor" and that "the prospects of her re-engaging in the work force are small."  AR 754.  In March 2019, Ontario-based occupational therapist Judy Phillips described "significantly reduced sitting, standing and walking tolerances" and concluded that, "from an occupational therapy perspective, [Ms. P.] remains unable to return to competitive employment."  AR 933.

Medical examiners in the United States nevertheless concluded that Ms. P.'s characterizations of "alleged pain" were "not consistent with evidence and not persuasive," and that Ms. P. retained the ability to sit, stand, and walk for six hours in a normal eight-hour workday.  AR 903, 909 (opinion of Dr. Jay Shaw).  She was assessed as retaining through her last insured date the residual functional capacity to engage in light work, subject to several postural limitations.  *See* AR 890 ("Physical MC finds that [Ms. P.] was capable of light work activities prior to 12/31/2016"); AR 686 ("Light RFC with postural limitations as noted for the adjudicate [sic] period.").

An administrative hearing was then conducted in March 2020.  AR 43.  Most relevant here, Ms. P. testified at the hearing about her sitting and standing tolerances and her current experience of pain.  She asserted that she could sit for ten minutes or "a little longer" with ice or heat to ease her pain.  AR 60.  She also testified to driving for "very short" periods of time lasting "maybe thirty, forty minutes."  AR 50.  She could ride as a passenger in a car for twenty-five to thirty minutes.  AR 51; *see also* AR 66–67 (describing her ride from Stayner, Canada to Buffalo, New York as requiring frequent stops and use of ice packs).  She testified that she could

6

walk for half an hour and "most of the time" stands on her left leg ("like a flamingo is what everybody says"), AR 59, though she alternated between standing and sitting every fifteen to twenty minutes.  AR 60 (endorsing a standing tolerance of "maybe 15, 20 minutes").  Over the course of the hearing—a seventy-one-minute affair, including a short break to retrieve Ms. P.'s ice-pack—Ms. P. alternated between sitting and standing four times.  *See* AR 51, 54–55, 78, 81.

Ms. P. also testified at the hearing that her pain is "constant."  AR 56.  She described the pain as so severe "all the time" that she is "constantly battling just keeping [her] thoughts together."  AR 54.  To cope, she rotates between ice and heat, stretches, rests in a fetal position, practices mindfulness and meditation, takes pain medication and injections, and tries "distraction therapy."  AR 56–57.  Ketamine infusions "made a difference" and medications worked sometimes, AR 57–58, but Ms. P. described being in "so much pain all the time that [she] can't cope with life."  AR 65.

A vocational expert, Joseph Atkinson, also testified at the administrative hearing.  AR 78.  Mr. Atkinson noted that Ms. P.'s past work experience involved sedentary and light work positions, including bookkeeper, receptionist, and administrative clerk.  *Id.*  He testified that a person able to sit, stand, and walk for six of eight hours in a normal workday, who must alternate between sitting and standing, and who requires a cane for ambulation, among other limitations, could work two of those past positions.  *See id.* at 78–80 (hypothetical two).  A person able to sit for six of eight hours but walk or stand only two of eight hours, and who must alternate between sitting and standing and use a cane to ambulate, could also work two of the three past positions.  *See id.* at 82–83 (hypothetical three).  Mr. Atkinson further testified that employer tolerance for time off task is "up to ten percent, in addition to normal breaks," and that employers on average

tolerate "no more than one unscheduled absence, early departure, or late arrival per month."  AR 83.

## III.    The Commissioner's Decision

After "careful consideration" of this record, the ALJ determined that Ms. P. had severe impairments of degenerative disc disease of the cervical and lumbar spine and degenerative joint disease of the right hip post total arthroplasty.  AR 29.  She further determined that these impairments, together with Ms. P.'s other non-severe impairments, did not meet or equal any of the Commissioner's Listings.  AR 31.  The ALJ then considered the record evidence and Ms. P.'s subjective symptoms and calculated that she retained the residual functional capacity through her last insured date to:

> perform light work as defined in 20 C.F.R. [§] 404.1567(b) except she could have lifted and carried no more than 15 pounds occasionally and 10 pounds frequently. She could have stood and walked for six hours in an eight-hour day and sat for six hours in an eight-hour day.  The claimant required the ability to alternate between sitting and standing for comfort.  As for postural limitations, she could have performed no more than occasional stooping, kneeling, crouching, crawling, and climbing of ramps and stairs [and] . . . could have performed balancing frequently, but could have never climbed ladders, ropes or scaffolds.  She could have performed overhead reaching no more than occasionally with her right upper extremity.  The claimant would have needed to avoid concentrated exposure to unprotected heights, heavy moving mechanical parts, and industrial vibration.  She also required the use of a cane to ambulate.

AR 32.

The ALJ acknowledged that Ms. P. reported more debilitating pain than she included in the RFC.  *See* AR 32–33.  She nevertheless determined that Ms. P.'s statements about the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record."  AR 33.  In support, the ALJ cited radiology studies showing only "mild osteoarthritis of [the] right hip in February 2015."  AR 33.  The ALJ noted post-surgery follow-up radiology studies showing "satisfactory alignment" of the hip.  *Id.*

Ultrasound findings were inconsistent with deep venous thrombosis.  *Id.*  "Thus," the ALJ concluded, "imaging studies of her right hip are not entirely consistent with the severity of [Ms. P.'s] allegations."  *Id.*  The ALJ also cited "mild radiology study findings" related to Ms. P.'s spine, treatment notes related to her gait and ambulatory ability, tenderness, range-of-motion deficits, and "lack of neurological or sensory deficits found during examinations."  AR 34; *see also* AR 31 (discounting theory about an impinged nerve due to lack of medical imaging).  The ALJ further noted that "by June of 2016, [Ms. P.] reported improvement in her symptoms, especially after injection therapy and restarting physiotherapy in November 2016."  *Id.*  The ALJ also reasoned that Ms. P.'s stated ability to walk for thirty minutes was "inconsistent with the severity of her current allegations."  AR 34–35.  The ALJ also weighed the medical opinions of various providers, assigning persuasive weight to state agency medical consultants and Dr. Shaw.  AR 35.  This evidence led the ALJ to conclude that Ms. P. could perform past work through her last insured date and was therefore not entitled to disability benefits under the Social Security Act.  AR 36.

## LEGAL STANDARD

The Court will uphold the Commissioner's decision to deny an individual disability benefits if the decision "is based on substantial evidence in the record and correctly applies the relevant legal standards."  *Butler*, 353 F.3d at 999.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation and citation omitted); *see also Butler*, 353 F.3d at 999 (substantial evidence is "more than a scintilla, but . . . less than a preponderance").  The Court must "carefully scrutinize" the administrative record for substantial evidence, but may not reweigh the evidence considered, *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (quotation omitted), as the Court's review is "highly deferential to the agency fact-finder."

*Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  The Commissioner's decision must nevertheless show that she "analyzed all evidence" and "sufficiently explained the weight" given to "obviously probative exhibits, including evidence that was rejected."  *Warfield v. Colvin*, 134 F. Supp. 3d 11, 14 (D.D.C. 2015) (internal citation and quotation omitted).

## DISCUSSION

Ms. P. urges the Court to reverse the Commissioner's decision for two reasons.  First, she says that the ALJ improperly evaluated her subjective symptoms of debilitating pain.  *See* Pl. Mem. at 14–19.  Second, she insists that the ALJ miscalculated her residual functional capacity. *See id.* at 19–23.  Because the RFC assessment must take into account any of Ms. P.'s credited subjective symptoms, *see* 20 C.F.R. § 404.1529(d)(4), the two arguments are interrelated and must be considered in turn.

## I.    Weighing of Subjective Symptoms

When a disability claimant alleges that subjective symptoms such as pain limit her ability to engage in gainful employment, regulations require the Commissioner or her designee to engage in a two-step evaluative process.  *Butler*, 353 F.3d at 1004 (citing 20 C.F.R. §§ 404.1529, 416.929).  At the first step "the claimant must adduce 'medical signs or laboratory' findings evidencing a 'medically determinable impairment that could reasonably be expected to produce'" the pain or other allegedly limiting symptoms.  *Id.* (citing 20 C.F.R. §§ 404.1529(a)– (b), 416.929(a)–(b); 42 U.S.C. §§ 423(a)(5)(A), 1382(H)(i)).  "The objective evidence must confirm the existence of an impairment reasonably expected to produce the actual pain, in the amount and degree, alleged by the claimant."  *Id.* (internal citation and quotations omitted). Here, Ms. P. complained of constant and almost completely debilitating pain related to but not fully explained by her 2014 accident and 2016 hip reconstruction.  *See* AR 54–58, 65.  She says

the pain affects her physical abilities and endurance as well as her mental capacity to concentrate, persist, and remember information.  *See* AR 54–55.  The ALJ determined that Ms. P. suffered from a medically determinable impairment that could be reasonably expected to cause Ms. P.'s pain.  *See* AR 33.

Under the regulations, the ALJ was then required to proceed to step two of the two-step process for evaluating Ms. P.'s subjective symptoms.  This second step "assesses the persistence and intensity of the claimant's pain as well as the extent to which it impairs her ability to work." *Butler*, 353 F.3d at 1004 (citing 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1)).  Because pain is "subjective and difficult to quantify," regulations require the Commissioner to take account of "any symptom-related functional limitations and restrictions reported by the claimant and her treating physician[s] which can be reasonably accepted as consistent with the objective medical evidence and other evidence."  *Id.* (internal quotations omitted).  Pain can "sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone."  20 C.F.R. § 404.1529(c)(3).  For that reason, the Commissioner should not reject a claimant's statements about pain or the limiting effects of her other symptoms "solely because the available objective medical evidence does not substantiate [the] statements."  *Id.* § 404.1529(c)(2).

The second step is at core a credibility determination.  *See Butler*, 353 F.3d at 1005 (discussing SSR 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of An Individual's Statements*, 1996 WL 374186, at *1 (SSA July 2, 1996)).  The Commissioner must make her credibility determination based on the "entire case record." *Id.*  Her written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons

for that weight." *Id.*; *see also* SSR 96-8p, 1996 WL 374184, at *7 ("In all cases in which symptoms, such as pain, are alleged," the Commissioner's decision must contain "a thorough discussion and analysis of the objective medical and other evidence."). Ultimately, since "credibility determinations are solely within the realm of the ALJ," the reviewing court "will only intercede where an ALJ fails to articulate a rational explanation for his or her finding." *Moore v. Berryhill*, 313 F. Supp. 3d 275, 283 (D.D.C. 2018) (internal quotations omitted).

The ALJ in this case believed that the alleged intensity, persistence, and limiting effects of Ms. P.'s pain were not "entirely consistent with" medical and other evidence in the record. AR 33. Ms. P. urges the Court to reverse that decision because the ALJ mischaracterized record evidence and ignored other probative information. *See* Pl. Mem. at 15. She cites a host of facts from the record, *see id.* at 15–17, as proof that the ALJ's decision to discount Ms. P.'s subjective symptoms was "obviously unsupported," *id.* at 17, and "mischaracterizes evidence that was presented." *Id.* at 18. The Commissioner responds only that the ALJ followed the applicable regulations, rehashing the ALJ's decision nearly line-by-line. *See* Def. Mem. at 10–13.

On close review—because neither party's brief helps much to clarify the point—the Court is convinced that Ms. P. is correct. Ms. P. compares the error here to the one in *Bryant v. Saul*, where Magistrate Judge Deborah A. Robinson recommended remand to the agency after an ALJ failed to address record evidence that the plaintiff had complained of severe pain prior to her last insured date. *See* Pl. Mem. at 19 (citing *Bryant v. Saul*, No. 16-cv-2196, 2019 WL 6619760 (D.D.C. Nov. 18, 2019), *report and recommendation adopted*, 2019 WL 6617757 (D.D.C. Dec. 5, 2019)). By way of example, Magistrate Judge Robinson pointed to evidence that the plaintiff in *Bryant* had complained to a doctor about "quite severe" pain and reported that the pain made her "unable to walk well and stand for a long time." 2019 WL 6619760, at *12.

The ALJ "noted" that the plaintiff had complained about severe pain, "but he did not consider that fact in his credibility determination." *Id.* That error warranted reversal and remand because "without consideration of any evidence about [the plaintiff's] complaints of pain," the court could not "meaningfully evaluate the ALJ's conclusions." *Id.*

The same failure to explicitly consider probative evidence that Ms. P. complained about severe, debilitating pain throughout her claimed disability period is evident here. After her accident, Ms. P. reported and sought treatment for significant pain in her back, shoulder, and neck. *See, e.g.*, AR 530–35. She continued to report pain in her back, buttock, groin, hip, shoulder, and neck after her hip replacement surgery and before her last insured date. *See* AR 151–52, 553–54, 820, 873–75. Her medical records also indicate that her pain significantly limited her physical ability to perform basic tasks associated with employability, including sitting, standing, and walking, *see* AR 151–52, 526, 537, 553–54, 871, and mental tasks such as maintaining concentration. *See* AR 716.

The ALJ acknowledged some of this evidence in her written decision, noting that Ms. P. "alleged experiencing constant pain of her right hip, neck, back, and shoulder" during the administrative hearing, as well as in August 2015 (when she last worked), March 2016 (after her surgery), and in June 2016 (after beginning injections and physiotherapy). AR 32–35. But the ALJ does not appear to have factored Ms. P.'s consistent complaints about pain into the credibility determination that Ms. P.'s subjective symptoms were only partially consistent with the record evidence. Instead, the ALJ's credibility determination appears to be based solely on objective radiology and ultrasound imaging, *see* AR 33–34, and physical examination findings about her gait and range of motion. *See* AR 34.

13

The ALJ also justified her credibility determination by highlighting Ms. P.'s response to "treatment." AR 34. This explanation would not alone cure the ALJ's failure to consider probative evidence about Ms. P.'s complaints about pain. But the explanation also mischaracterizes the evidence cited, and so requires additional comment. Ms. P. did not report a straightforward "improvement in her symptoms, especially after injection therapy and restarting physiotherapy in November 2016," as the ALJ suggests. AR 34 (ALJ's characterization of evidence). The evidence cited shows that Ms. P. reported consistent, stubborn pain that was not relieved by injections or physiotherapy. *See* AR 796 (cited by the ALJ as Exhibit 23F at 13, which documents a temporary "significant *worsening* of her pain" following injection therapy, followed by a "gradual improvement"); AR 816 (cited by that ALJ as Exhibit 23F at 33, which notes that "[p]ain levels in the [hip] region are slowly settling," but that Ms. P. "does, however, complain of ongoing right sided facial, TMJ and ear pain"); AR 819 (cited by the ALJ as Exhibit 23F at 33, which reports that "[p]ain levels continue to be an issue"); AR 877 (cited by the ALJ as Exhibit 23F at 94, which documents "ongoing right side back neck hip leg pain" and Ms. P.'s concern that "[something] has somehow been missed"); AR 882 (cited by the ALJ as Exhibit 23F at 99, which notes that despite "working very diligently continuing her physiotherapy [and] cognitive behavioral therapy, [Ms. P.] does have a lot of pain").

These errors—both the failure to consider probative evidence about Ms. P.'s consistent complaints about pain and the active mischaracterization of evidence in the record—warrant reversal and remand.[4] On remand, when assessing the persistence and intensity of Ms. P.'s pain

---

[4] Ms. P. also theorizes that the ALJ erred in weighing her subjective symptoms by misconstruing a radiology study of Ms. P.'s cervical and lumbar spine, because other evidence in the record demonstrates "more than mild findings." Pl. Mem. at 15. There was no error on this point, however. Ms. P. cites a November 2016 study that showed "soft tissue densi[t]y posterior to the superior endplate that may be a disc." *Id.* (citing AR 854). But the November 2016 record

and the extent to which that pain impaired her ability to work, the Commissioner is directed to explicitly address Ms. P.'s consistent reports to doctors and therapists about her pain during her claimed disability period, as well as those doctors' and therapists' repeated documentation that the pain was not wholly responsive to her treatment regimen.

## II.      The ALJ's RFC Calculation

The ALJ calculated Ms. P.'s residual functional capacity based in part on her assessment of Ms. P.'s pain—a credibility determination that was not rationally explained, as detailed above. That error requires that the ALJ reconsider Ms. P.'s RFC on its own.  For purposes of administrative and judicial economy, however, the Court also addresses Ms. P.'s remaining concerns about the ALJ's RFC assessment.

A claimant's RFC is supposed to describe her "uppermost ability to perform regular and continuous work-related physical and mental activities in a work environment."  *Butler*, 353 F.3d at 1000.  To calculate the RFC, the Commissioner must perform "a 'function-by-function' inquiry based on all of the relevant evidence of a claimant's ability to do work" and describe her assessment in a "narrative discussion" that links record evidence with each conclusion.  *Id.*

---

describes a "*tiny*" soft tissue density that "*may be*" the "inferior margin" of a disc.  AR 854 (emphasis added).  The record notes that *if* there is "clinical suspicion of a T12-L1 disc then further imaging with MRI could be obtained."  *Id.*  Other findings in the report are described as "mild" and "slight," and the conclusions are tentative at best: "This *may* be irritating the exiting nerve root."  *Id.*  The ALJ need not reconsider this evidence on remand.

Ms. P. also theorizes that her reports of pain were "abnormal" compared to objective medical tests.  *See* Pl. Mem. at 15–16.  She cites ample evidence that she consistently approached her doctors about stubborn, intense pain in her hip, back, and right upper extremities throughout her claimed period of disability, including after her hip surgery.  *See id.* at 15–17. But the ALJ did not ignore the abnormality of Ms. P.'s reported pain—its abnormality is exactly the ALJ's point.  The ALJ believed that objective medical evidence and physical examination findings did not support "the extent" of Ms. P.'s pain allegations.  AR 34.  That conclusion is consistent with record evidence that Ms. P. held "catastrophizing" beliefs about her pain.  *See* AR 152, 554 (conclusion by physiotherapist Dr. Lapenskie).  The ALJ therefore need not reconsider evidence of Ms. P.'s "abnormal" pain on remand.

(quoting SSR 96–8p, 1996 WL 374184, at *3, *7).  A "written function-by-function analysis is not required" so long as the narrative discussion is sufficiently detailed to allow the Court to follow the ALJ's analysis.  *Banks v. Astrue*, 537 F. Supp. 2d 75, 85 (D.D.C. 2008).  That requires a "logical bridge" between the evidence cited and the ALJ's conclusion.  *Cobb v. Astrue*, 770 F. Supp. 2d 165, 171 (D.D.C. 2011).  Any "material inconsistencies or ambiguities evident in the record" must also be explained, as well as the reasons the ALJ rejected any "medical opinions in conflict with the ultimate RFC determination."  *Butler*, 353 F.3d at 1000 (internal quotations omitted).

Ms. P. has identified several alleged defects in the ALJ's RFC analysis.  One alleged defect is that the ALJ provided "no analysis of the objective medical evidence."  Pl. Mem. at 20.  The evidence Ms. P. cites for this point is primarily documentation of her reports of pain to physicians and therapists—an issue already addressed above.  There is no need to address that evidence again here.

Ms. P. also alleges that the ALJ's RFC calculation is flawed because the ALJ relied on the opinion of reviewing physician Dr. Shaw, "who gives a mere few sentences of explanation as to why he finds plaintiff could perform light work and cites only one visit in the entire record to support" his conclusion.  Pl. Mem. at 20–21.  This Court will not re-weigh opinion evidence credited by the Commissioner.  *See Cunningham*, 46 F. Supp. 3d at 32.  But it is not clear here whether the ALJ considered other, contrary opinion evidence in the record, including the opinions of the three Canadian experts who uniformly agreed that Ms. P.'s pain prevented her from working.  *Compare* AR 35–36 (ALJ's explanation about medical opinion credibility) *with* AR 716, 754, 933 (opinions by Ms. Scrbic, Dr. Karabatsos, and Ms. Phillips).  The ALJ did note that she found opinions "outside the relevant period of adjudication minimally persuasive," AR

35, and the Canadian employment assessments were all rendered after Ms. P.'s last insured date. But the ALJ's explanation for this approach points to an opinion about Ms. P.'s capacity to work *before* Ms. P.'s alleged onset date.  *See id.* (discussing opinion "dated during a period where the claimant was working at substantial gainful activity").  The same logic cannot explain the ALJ's decision to discount opinions that *post-date* her alleged disability onset date—particularly because Dr. Shaw's opinion was also formed long after Ms. P.'s claimed disability period, in March 2019.  *See* AR 909.  The Court takes no position on the persuasiveness of opinions from 2017 and beyond.  On remand, however, the ALJ must address whether the opinions of Ms. Scrbic, Dr. Karabatsos, and Ms. Phillips are persuasive and why, particularly since all three opinions appear to be based on the limiting effects of Ms. P.'s pain.  Only with additional explanation can the Court determine whether the ALJ considered and rationally rejected these opinions or simply ignored them.  *See Warfield*, 134 F. Supp. 3d at 14 (D.D.C. 2015).

Ms. P. also questions how the ALJ arrived at several of the physical limitations in Ms. P.'s RFC, including her ability to perform "light work," Pl. Mem. at 20, and her assessed ability to lift and carry fifteen pounds and sit, stand, and walk for six hours in an eight-hour day.  *See id.* at 22.  Those limitations appear to be drawn from the opinion of Dr. Shaw, which the ALJ gave persuasive weight.  *See* AR 35, 903.  But the record contains both inconsistencies and conflicting medical opinions on Ms. P.'s ability to consistently perform these physical tasks.  A September 2016 assessment that Ms. P. evidenced "sitting intolerance," for example, *see* AR 537, is consistent with Ms. P.'s statements during the hearing that she prefers to stand and is unable to sit for more than thirty to forty minutes at a time.  *See* AR 50, 59–60, 66–67.  Maybe that evidence is adequately addressed by the limitation that Ms. P. must "alternate between sitting and standing for comfort."  AR 32.  But if so, why can she sit or stand for just six of eight hours

in a normal workday?  Why not more?  Why not less?  The lack of explanation is particularly suspect given the ALJ's proposed hypotheticals to the vocational expert during the administrative hearing, which requested information about an individual who could sit for just two hours in an eight-hour day.  *See* AR 82–83.  Why did the ALJ measure Ms. P.'s sitting tolerance at six rather than two hours?  Reliance on Dr. Shaw's opinion cannot fully explain the decision, because the ALJ departed from Dr. Shaw's assessment that she could regularly lift twenty rather than fifteen pounds.  *Compare* AR 32 *with* AR 903.  As written, the specific functional limits in the RFC impede "effective judicial review," *Cobb*, 770 F. Supp. 2d at 171, so remand is appropriate to allow the Commissioner to address the issues discussed in this opinion.

Before closing, the Court makes a final observation about the impact of these RFC errors. The Commissioner noted in her brief to this Court that the ALJ ultimately determined that Ms. P. was not disabled because she could perform past work as a bookkeeper and receptionist—two sedentary jobs "which require *far less exertion* than the RFC finding for light work."  Def. Mem. at 15 (emphasis original).  The suggestion seems to be that the ALJ's error, if any, was harmless, because even a more limiting RFC would have resulted in determination at step four that Ms. P. could perform past relevant work.  *See Saunders v. Kijakazi*, 6 F.4th 1, 4 (D.C. Cir. 2021) ("[E]ven if we perceive error, we will affirm the Commissioner's decision unless the error is prejudicial.").  The error here was not harmless, however.  "A sedentary job is defined as one which involves sitting," 20 C.F.R. § 404.1567(a)—one of the core limitations that Ms. P. insists impedes her ability to work.

## CONCLUSION

For these reasons, the Court grants Ms. P.'s Motion for Judgment of Reversal and denies the Commissioner's Motion for Judgment of Affirmance.  Further proceedings should specifically address Ms. P.'s consistent reports of pain, her expressions about the limiting effects

of her pain, and the limited effectiveness of her pain treatments.  The Commissioner should also further assess Ms. P.'s residual functional capacity during her alleged period of disability, specifically explaining each of her functional limitations and specifically addressing opinions in the record that Ms. P. was not able to engage in gainful employment due to her pain.

Date: April 18, 2023.

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE